**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
                                                      :
In re                                                 :   Chapter 11
                                                      :   Case No. 08-23660 (RDD)
MACMENAMIN'S GRILL LTD.,                               :
                                                      :
                                                      :
            Debtor.                                   :
--------------------------------------------------------------------x
                                                      :
ROBERT L. GELTZER, AS CHAPTER 11 TRUSTEE              :
FOR MACMENAMIN'S GRILL LTD.,                           :
                                                      :
            Plaintiff,                                :
                                                      :
      v.                                              :   Adv. Pro. No. 09-8266 (RDD)
                                                      :
JAMES F. MOONEY, MARK HANTHO,                         :
NEIL CLARK AND TD BANK, N.A.,                          :
                                                      :
            Defendants.                               :
--------------------------------------------------------------------x

### MEMORANDUM OF DECISION ON DEFENDANTS'
### MOTIONS FOR SUMMARY JUDGMENT

Appearances:   Squire, Sanders & Dempsey LLP, by Robert A. Wolf, Esq. and Peter A.
               Zisser, Esq., for Robert L. Geltzer, as chapter 11 trustee of MacMenamin's
               Grill LTD.

               Todtman, Nachamie, Spizz & Johns, P.C., by Alex Spizz, Esq.,
               for James F. Mooney, Mark Hantho and Neil Clark.

               Ostrowitz & Ostrowitz, by Alan R. Ostrowitz, Esq. and Jennifer Marcus,
               Esq., for TD Bank, N.A.

Hon. Robert D. Drain, United States Bankruptcy Judge:

           The chapter 11 trustee (the "Trustee") of the above debtor (the "Debtor")

has filed a complaint seeking, under section 548(a)(1)(B) of the Bankruptcy Code, 11

U.S.C. § 101 et seq., as well as under section 544(b) of the Bankruptcy Code to the extent

that it incorporates sections 273, 275 and 278 of the New York Debtor and Creditor Law,

to avoid allegedly fraudulent transfers of the Debtor's cash to purchase the stock in the Debtor formerly owned by the three individual defendants (the "Shareholders"), as well as the loan from TD Bank, N.A. (and related security interest), the proceeds of which were used by the Debtor to fund the stock purchase, and to recover the transfers or the value thereof under section 550 of the Bankruptcy Code.  The Trustee has sought to avoid the stock purchases and the TD Bank, N.A. loan and security interest only as constructively fraudulent; he has not asserted that the Debtor's purchases of the Shareholders' stock and the loan incurred by the Debtor to pay for the purchase and the related security interest in substantially all of the Debtor's assets were intentionally fraudulent.

The Shareholders and TD Bank, N.A. each moved for summary judgment under Fed. R. Bankr. P. 7056, which incorporates Fed. R. Civ. P. 56, on the basis that section 546(e) of the Bankruptcy Code bars the Trustee's avoidance claims and moots the application of section 550, which applies as a remedy only for avoidable transfers.[1]

This memorandum explains the Court's basis for denying both motions.

## **Jurisdiction**

The Court has jurisdiction over this proceeding, arising under sections 544 and 548 of the Bankruptcy Code, pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

## **Standard on Summary Judgment**

Under Fed. R .Civ. P. 56(a) the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and it is entitled to

---

[1] TD Bank, N.A. has not moved for summary judgment on the Trustee's claims under sections 547(b) and 549 of the Bankruptcy Code to avoid later payments to it.

judgment as a matter of law.  Subject to Fed. R. Civ. P. 56(c)(2)-(4) and 56(d)-(e), a party

asserting that a fact cannot be, or is, genuinely disputed must support the assertion by (a)

citing to particular parts of the record, including depositions, documents, electronically

stored information, affidavits, or declarations, stipulations (including those made only for

purposes of the motion), admissions, interrogatory answers, or other materials, or (b) by

showing that the record does not establish the absence, or presence, as the case may be,

of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  The movant bears the initial burden to

satisfy each material element of its claim or defense.  Vt. Teddy Bear Co. v. 1-800

BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004); Isaac v. City of New York, 701 F.

Supp.2d 477, 485 (S.D.N.Y. 2010), aff'd 271 Fed. Appx. 60 (2d Cir. 2008).  Upon such a

showing, the nonmoving party must provide evidence of a genuine issue of material fact

to successfully oppose the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Radio

Corp., 475 U.S. 574, 586 (1986).  Facts are material if they "might affect the outcome of

the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).

       The Court "is not to weigh the evidence but is instead required to view the

evidence in the light most favorable to the party opposing summary judgment, to draw all

reasonable inferences in favor of that party, and to eschew credibility assessments."

Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004).  A summary

judgment motion may not be defeated by conclusory or self-serving statements, by

simply raising metaphysical doubts about a material fact or by identifying immaterial

disputed facts, Anderson v. Liberty Lobby, 477 U.S. at 247-48; Matsushita Elec., 475

U.S. at 586, although "if there is any evidence in the record from any source from which

a reasonable inference in the non-moving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007). See generally Matsushita Elec., 475 U.S. at 586.

Of course, where the parties do not dispute the material facts, disagreeing instead on the outcome based on the applicable law, the matter is appropriate for summary judgment. Adirondack Transit Lines, Inc. v. United Transp. Union, 305 F.3d 82, 84 (2d Cir. 2002).

### Facts

The parties agree on the relevant material facts. Until August 31, 2007, the Shareholders each owned 31 percent of the issued and outstanding common stock of the Debtor, a bar and grill. On July 6, 2007 they entered into a Stock Purchase Agreement with the Debtor under which they agreed to sell their stock to the Debtor -- a classic LBO, although writ small.[2] To fund the stock sale, the Debtor entered into a Loan and Security Agreement with Commerce Bank, N.A. (the "Lender")[3] under which the Lender agreed to loan the Debtor $1,150,000. The loan was a Small Business Administration guaranteed loan, and attached to the SBA Settlement Sheet, dated August 31, 2007 and executed by representatives of the Lender and the Debtor, was a schedule of how the Lender was to make the loan payments: with the exception of fees, the loan proceeds were to be paid $390,000 to defendant Clark "to purchase stock," $334,983.07 to defendant Mooney "to purchase stock," and $390,000 to defendant Hantho "to purchase stock."

---

[2] The parties amended the Stock Purchase Agreement on August 8, 2007 to increase the purchase price.

[3] TD Bank, N.A. is Commerce Bank, N.A.'s successor in interest.

The closing of the Loan and Security Agreement and of the Amended Stock Purchase Agreement took place on August 31, 2007, with the foregoing payments being made to the Shareholders from the loan proceeds by the Lender, not the Debtor. The Lender wire transferred Mr. Clark's payment into his account at JPMorgan Chase, Mr. Mooney's payment into his account at U.S. Alliance Federal Credit Union, and Mr. Hantho's payment into his account at JPMorgan Chase.  These were the only payments received by the Shareholders for the contemporaneous sale of their stock to the Debtor. At the same time, the Debtor secured the loan by granting the Lender a security interest in substantially all of its assets.

For purposes of the present motions, the parties agree that the Debtor did not receive fair consideration or reasonably equivalent value for the payments to the Shareholders or for the incurrence of the loan and the grant of the security interest to the Lender.  The parties also have stipulated for purposes of the motion that on August 31, 2007 the Debtor was insolvent or became insolvent as a result of incurring the loan obligation and using the proceeds to purchase the Shareholders' stock.  The Debtor filed its chapter 11 petition on November 18, 2008 (the "Petition Date"), and the Trustee commenced this adversary proceeding within the limitations period set forth in section 546(a)(1) of the Bankruptcy Code.

## Discussion

**The Shareholders' Summary Judgment Motion.**  The Shareholders acknowledge that under the foregoing facts the Debtor's purchase of their stock would be an avoidable constructive fraudulent transfer under both section 544(a) of the Bankruptcy Code (incorporating New York Debtor and Creditor Law sections 273, 275 and 278) and

5

section 548(a)(1)(B) of the Bankruptcy Code <u>but for</u> the application of section 546(e) of

the Bankruptcy Code.  They contend that section 546(e)'s safe harbor applies to them,

while the Trustee argues that it does not.

Section 546(e) of the Bankruptcy Code, states,

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, <u>the trustee may not avoid a transfer that is a</u> margin payment, as defined in section 101, 741 or 761 of this title, or <u>settlement payment as defined in section</u> 101 or <u>741 of this title</u>, <u>made by or to</u> (or for the benefit of) <u>a</u> commodity broker, forward contract merchant, stockbroker, <u>financial institution</u>, financial participant, or securities clearing agency, <u>or that is a transfer made by or to</u> (or for the benefit of) <u>a</u> commodity broker, forward contract merchant, stockbroker, <u>financial institution</u>, financial participant, or securities clearing agency, <u>in connection with a securities contract</u>, <u>as defined in section 741(7)</u>, commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (emphasis added).[4]

Section 741(8) of the Bankruptcy Code defines a "settlement payment" as

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

11 U.S.C. § 741(8).  Section 101(22) defines a "financial institution" as, among other

things, "an entity that is a commercial or savings bank [or a] federally-insured credit

union."  11 U.S.C. § 101(22)(A).  Section 741(7) of the Bankruptcy Code defines a

"securities contract," as, among other things, "a contract for the purchase . . . of a

security," 11 U.S.C. § 741(7)(A)(i), and the Bankruptcy Code defines a "security" to

---

[4] The current version of section 546(e) was in effect on the Petition Date.   Section 546(e) was last amended by the Financial Netting Improvements Act of 2006, Pub. L. No. 109-390 (2006) (the "2006 Amendment), which became effective in bankruptcy cases commenced on and after December 12, 2006.

include "stock," without reference to whether such stock is publicly traded.  11 U.S.C. § 101(49)(A)(ii).

The parties do not dispute that the Lender and the Shareholders' banks were "financial institutions."  Nor can they dispute that the Shareholders' stock in the Debtor constituted "securities."  Although both sides agree that the definition of "settlement payment" is frustratingly self-referential -- essentially stating that a "'settlement payment' is a 'settlement payment'" (see QSI Holdings v. Alford (In re QSI Holdings, Inc.), 571 F.3d 545 (6th Cir. 2009), cert. denied 130 S. Ct. 1141 (2010)) -- the Trustee also apparently acknowledges that generally any payment to purchase stock, including stock that, as here, is not publicly traded, may be viewed as a "settlement payment."  (The Trustee also does not dispute that generally an agreement to purchase stock may be viewed as a "securities contract.")

The Shareholders therefore argue that the transfers that the Trustee seeks to avoid -- the payments of the loan proceeds, as instructed by the Debtor, from the Lender into the Shareholders' respective bank accounts in return for the Shareholders' sale of their stock in the Debtor -- fall within the plain meaning of section 546(e)'s safe harbor in two ways.  First, they contend that each was a transfer constituting a settlement payment made by (and to) a financial institution.  Alternatively, consistent with the 2006 Amendment, they argue that each payment was a transfer by (and to) a financial institution in connection with a securities contract.  11 U.S.C. § 546(e).[5]

_____

[5] See Lowenschuss. v. Resorts Int'l, Inc. (In re Resorts Int'l Inc.), 181 F.3d 505, 514, 516 (3d Cir. 1999), cert. denied (holding that a "settlement payment" means "the transfer of cash or securities made to complete a securities transaction" and that the phrase "made by or to . . . a financial institution" includes a wire transfer of payment from the debtor's bank account to the selling stockholder). See also Interbulk, Ltd. v. Louis Dreyfus Corp.

Notwithstanding section 546(e)'s apparent plain meaning, however, several courts have disagreed with the view that it necessarily exempts private stock transactions like these from avoidance as constructive fraudulent transfers.  See, e.g., Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.), 321 B.R. 527, 538-41 (B.A.P. 9th Cir. 2005); Buckley v. Goldman, Sachs & Co., 2005 U.S. Dist. LEXIS 9626, at *26-30 (D. Mass. May 20, 2005); Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 478-80 (S.D.N.Y. 2001); Zahn v. Yucaipa Captial Fund, 218 B.R. 656, 675-76 (D. R.I. 1998); Jewell Recovery L.P. v. Gordon (In re Zale Corp.), 196 B.R. 348, 352-53 (N.D. Tex. 1996); Wieboldt Stores, Inc. v. Schottenstein, 131 B.R. 655, 663-65 (N.D. Ill. 1991); D.E.I. Sys. v. Bevan (In re D.E.I. Systems, Inc.), 2011 Bankr. LEXIS 1143 (Bankr. D. Utah April 5, 2011); Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.), 374 B.R. 833, 845-46 (Bankr. S.D. Fla. 2007); Official Comm. of Unsecured Creditors v. Lattman (In re Norstan Apparel Shops, Inc.), 367 B.R. 68, 76-77 (Bankr. E.D.N.Y. 2007); Official Comm. of Unsecured Creditors v. Asea Brown Boveri, Inc. (In re Grand Eagle Co.), 288 B.R. 484, 494 (Bankr. N.D. Ohio 2003).[6]

These decisions note that granting a safe harbor to a constructively fraudulent private stock sale has little if anything to do with Congress' stated purpose in

---

(In re Interbulk, Ltd.), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ("A natural reading of 'in connection with' [in a similar section of the Bankruptcy Code, section 546(g)] suggests a broader meaning similar to 'related to.'"); see also Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.), 390 B.R. 595, 597-99 (Bankr. N.D. Ill. 2008) (prejudgment attachments were obtained 'in connection with' a swap agreement for purposes of section 546(g)).

[6] See also 5 Collier on Bankruptcy ¶ 546.06[2][b][i] (16th Ed. 2010) ("There is significant disagreement among courts about whether the section 546(e) defense is limited to transfers made in connection with the public securities markets or whether the statute also encompasses transfers related to nonpublic transactions.").

enacting section 546(e):  reducing systemic risk to the financial markets.  As stated in In re Norstan Apparel, "It is important to recognize that Congress enacted § 546(e) 'to minimize the displacement caused in the commodities and securities markets in the event [of] a major bankruptcy affecting those industries,' and 'to prevent the 'ripple effect' created by 'the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected industry.'"  367 B.R. at 76, quoting H. Rep. No. 97-420, at 1 (1982) (internal citation and quotation omitted).

That policy continues for the 2006 Amendment, as well, which was intended to "help reduce systemic risk in the financial markets," H. Rep. 109-648 (Part 1), at 1, by clarifying the exemption's application to transactions functionally similar to those already covered by the prior version of section 546(e).  "The common thread of these transactions is that they involve financial intermediaries -- stockbrokers, financial institutions, financial participants or securities clearing agencies -- that often hedge their risk on these transactions through other market transactions, repledge securities collateral received under these transactions, or both.  As such these transactions implicate the systemic risk concerns that are addressed by the safe harbors."  Id. at 4.[7]  See also Buckley v. Goldman, Sachs & Co., 2005 U.S. Dist. LEXIS 9626 at *28-29 ("The object

---

[7] A different authority had taken the position that securities transactions involving a "mere intermediary" financial institution or stockbroker without a beneficial interest in the transferred asset were not intended to be covered by section 546(e).  Munford v. Valuation Research Corp. (In re Munford, Inc.), 98 F.3d 604, 610 (11th Cir. 1996), cert. denied 522 U.S. 1068 (1998).  However, the foregoing legislative history, in addition to the statute's plain meaning, confirms the reasoning of the many cases that have disagreed with this view. Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.), 590 F.3d 252, 257-58 (3d Cir. 2009), cert. denied, 130 S.Ct. 2389 (2010); In re QSI Holdings, Inc., 571 F.3d at 550-51 (noting that the statute does not limit its application to intermediaries with a beneficial interest in the transferred property); In re Refco Secs. Litig. v. CSFB, 2009 U.S. Dist. LEXIS 129944, at *30-31 (S.D.N.Y. Nov. 13, 2009) (same).

that Congress sought to accomplish by enacting § 546(e) was to protect the operation of

the security industry's clearance and settlement system.  That interest is not furthered in

any meaningful sense by bringing an LBO like the one at issue in this case under the

exemption of § 546(e) simply because funds fortuitously passed through financial

institutions on their way into the hands of the defendants.").

   These decisions addressed their conflict with section 546(e)'s apparent

plain meaning in various ways discussed below (because, of course, "It is well

established that when the statute's language is plain, the sole function of the courts -- at

least where the disposition required by the text is not absurd -- is to enforce it according

to its terms." Lame v. United States Trustee, 540 U.S. 526, 534 (2004), quoting Hartford

Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)).  Before

turning to those arguments, however, it should be noted that several other courts,

including the circuit courts of appeal that have considered the issue (with the exception of

the Munford decision discussed in footnote 7 above), have held, based on their view of

section 546(e)'s plain meaning, that the provision's exception to avoidance applies to

payments by or to a financial institution or stockbroker for privately traded securities in

LBOs, including to insiders, as well as to publicly traded securities.  See, e.g., In re QSI

Holdings, Inc., 571 F.3d at 550-51; Brandt v. B.A. Capital Co., LP (In re Plassein Int'l

Corp.), 590 F.3d 252, 258-59 (3d Cir. 2010), cert. denied 130 S. Ct. 2389 (2010);

Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 987-88 (8th Cir. 2009); Official

Committee of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.),

344 B.R. 340, 367-70 (W.D. Pa. 2006) (stock redemption); Official Comm. of Unsecured

Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.), 274 B.R. 71, 87 (D. Del.

2002); <u>Official Comm. of Unsecured Creditors of The IT Group, Inc. v. Acres of Diamonds, L.P.</u> (<u>In re The IT Group, Inc.</u>), 359 B.R. 97, 100-102 (Bankr. D. Del. 2006). <u>See generally</u> Irma V. Fox, "Settlement Payment Exception to Avoidance Powers in Bankruptcy:  An Unsettling Method of Avoiding Recovery from Shareholders of Failed Closely Held Company LBOs," 84 Am. Bankr. L.J. 571, 573 (2010) ("The application of the settlement payment exception is problematic because of the contradiction between the broad literal wording of the exception and its narrow legislative purpose.  The language of the statute is quite expansive and arguably exempts all stock transactions from avoidance, while the legislative history indicates that the statute meant to protect only the market for publicly traded stock.").

Courts that have refused to apply section 546(e) to a private stock transfer have done so in part based on their belief that the Bankruptcy Code's definition of "settlement payment" is limited by the phrase "or any other similar payment commonly used in securities trade" that appears at the end of Bankruptcy Code section 741(8).  In other words, they have argued that this language in section 741(8), incorporated by cross reference in section 546(e), expressly limits the safe harbor's broad reach.  <u>See</u>, <u>e.g.</u>, <u>Kipperman</u>, 321 B.R. at 538; <u>Norstan Apparel</u>, 367 B.R. at 75 (holding that because private stock sales in connection with an LBO are not "commonly part of the securities trade," they were not covered by the statute);  <u>D.E.I. Sys. v. Bevan</u>, 2011 Bankr. LEXIS 1143 at *16-20.

It is clear, however, that the phrase at the end of section 741(8) -- "or any other similar payment commonly used in the securities trade" -- does not serve to modify the categories of payments that precede it but, rather, broadens the definition's scope, as a

catchall.  See Contemporary Indus. Corp. v. Frost, 564 F.3d at 986; Alfa, S.A.B. de C.V.

v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.), 422 B.R.

423, 433-334 (S.D.N.Y. 2009).

Nevertheless, it is also clear that, even before turning to the legislative

history, the context of section 546(e) is in fact tied to the securities markets, a context that

is highlighted by the catchall phrase appearing at the end of section 741(8) (even if it is

only a catchall) but is best seen in the placement within the Bankruptcy Code of section

546(e)'s key definitional cross references, Bankruptcy Code sections 741 and 761.

Section 741 appears in subchapter III of chapter 7 of the Bankruptcy Code, which

governs stockbroker liquidations; section 761 appears in subchapter IV of chapter 7,

which governs commodity broker liquidations.  It is logical to assume, therefore, that the

cross-references in section 546(e) to the definitions found in sections 741 and 761 relate

to the business of being a broker, engaged in markets.  See Robert G. Richardson,

"Unsettled 'Settlement Payments' in § 546(e)," 27-3 Am. Bankr. Inst. L.J. 12, 44 (2008):

> Considering that the term [settlement payment] is defined in the
> subchapter that deals with the liquidation of stockbrokers, entities defined
> in § 101(53A) as persons that are engaged in the 'business of effecting
> transactions in securities,' an argument can be made that a settlement
> payment as the term is defined in § 741(8) means a transfer of . . .
> securities made in the context of a formal securities market.  The
> transaction must [at least] involve persons in the 'business' of dealing with
> securities.

In that context, section 741(8)'s reference to the "securities trade" (emphasis added),

although, as discussed above, in the nature of a catch-all provision, suggests that

Congress was limiting the extent of its catch-all, and, therefore, the reach of section

546(e) as a whole, to the business of engaging in securities transfers.

Given this context, or, more generally, the perceived ambiguity of section 741(8)'s circular, self-referential and unhelpful definition of "settlement payment,"[8] several courts have looked beyond the statute's words to the legislative history to discern the exemption's limits, and that history, as discussed above, clearly shows that Congress did not intend section 546(e)'s exemption to apply to the modest private LBO transaction at issue here. See Kipperman, 321 B.R. at 539-40; Zahn v. Yukaipa, 218 B.R. at 676; Jewel Recovery, 196 B.R. at 352; Kapila v. Espirito Santo Bank, 374 B.R. at 345-46; Norstan Apparel, 367 B.R. at 76; D.E.I. Sys. v. Bevan, 2011 Banrk. LEXIS 1143 at *8-10, *18-20.

If, on the other hand, one accepts that, as understood by people who engage in the securities business, a "settlement payment" is any payment to complete the sale of a security, including stock[9] (although Congress could have said "the purchase or sale of a security" instead of "settlement payment"), the statute is not ambiguous and recourse to the legislative history should be precluded. See In re QSI Holdings, 571 F.3d at 550; In re Plassein Int'l, 590 F.3d at 258; Contemporary Indus. Corp. v. Frost, 564 F.3d at 986. The latter view is supported by the fact that Congress did not expressly limit the reach of section 546(e)'s exemption to public or to market transactions. Id.

---

[8] "The difficulty with the definition of 'settlement payment' is that it relies on a conclusory list of securities industries terms of art that contain the words 'settlement payment' without articulating the elements of a settlement payment." Kipperman, 321 B.R. at 538.

[9] See Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.), 341 B.R. 451, 456 (Bankr. S.D.N.Y. 2006) ("In the securities industry, any transfer of cash or securities to complete a securities transaction is considered a settlement payment.") (internal citations and quotation omitted).

Moreover, after the 2006 Amendment, not only "settlement payments" are protected but also "transfers made by or to . . . a financial institution . . . in connection with a securities contract" -- on its face an even broader exemption than the settlement payment safe harbor discussed above. Given the various agendas and interests of members of Congress, one looks skeptically on maxims of statutory interpretation based on Congress' presumed awareness of what was going on in the courts before a bill's enactment, not to mention the notion that each member of Congress shares the same view about how a bill will affect existing precedent. Lamie, 540 U.S. at 537 ("Congressmen typically rely on the language of a bill."). Nevertheless, at a minimum, the 2006 Amendment broadened the reach of section 546(e) -- apparently far enough on its face to provide an alternate basis to cover the present matter before the Court -- when Congress had the chance, instead, to narrow the exemption in recognition of the controversy over whether section 546(e) applies only to transactions involving a market or market participants.

The courts that do not apply the safe harbor to private transactions like the one at issue therefore generally make an additional argument: that exempting transactions like the sale of the three Shareholders' stock in their bar and grill from avoidance is so far removed from achieving Congress' professed intent to protect the financial markets that it would be absurd to apply section 546(e) to the Trustee's well established and important avoidance powers under sections 544 and 548(a)(1)(B) and (b) of the Bankruptcy Code. See United States v. Ron Pair Enters., 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.

14

In such cases, the intention of the drafters, rather than the strict language, controls."); Lamie, 540 U.S. at 534 (noting "absurd result" exception to rule of strict statutory construction); United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543-44 (1940) (noting both the "contrary to Congress' intention" and "absurd result" exceptions to plain meaning rule).

The Norstan Apparel court relied on these two often conflated exceptions to the plain meaning rule when it was asked to apply section 546(e) to a private stock sale of a closely held company -- in that case a sale by two shareholders instead of by the three Shareholders here. 367 B.R. at 73, 76-77. Moreover, the Sixth Circuit in QSI Holdings distinguished the large private LBO transaction before it (with a $208 million purchase price and hundreds of selling shareholders, where at least some of the sales went through a financial intermediary that was arguably involved in the securities markets) from the transaction in Norstan, suggesting that it, too, might have reached the same result as Norstan if presented with similar facts. In re QSI Holdings, 571 F.3d at 548, 550.[10] See also D.E.I. Sys. v. Bevan, 2011 Bankr. LEXIS 1143 at *6-12 (exempting selling shareholders merely because banks honored a depositor's instruction to pay "would be much too broad to fulfill the expressed Congressional intent."); Official Comm. of Unsecured Creditors v. ASEA Brown Boveri, Inc. (In re Grand Eagle Cos.),

---

[10] The District Court in QSI also noted that "the courts will continue to winnow out those exceptional cases at the far end of the spectrum where the exemption is unwarranted, discussing favorably four instances in the Enron chapter 11 case where the bankruptcy court "applied the statutory framework to the facts of each case, reaching different results in determining whether the transactions qualified as settlement payments." QSI Holdings, Inc. v. Alford, 382 B.R. 731, 743 (W.D. Mich. 2007), aff'd, QSI, 571 F.3d at 545.

288 B.R. 487, 494 (Bankr. N.D. Ohio) (same).    Cf. Contemporary Indus. Corp. v. Frost,

564 F.3d at 987:

> [The plaintiff] contends that it is unreasonable to construe § 546 as
> exempting these payments, the reversal of which would in no way impact
> the stability of the financial markets. . . .    We see no absurdity in that
> result.  Instead, particularly because so much money [$26.5 million] is at
> stake, we question [plaintiff's] assertion that the reversal of the payments -
> - at least a portion of which were probably reinvested -- would in no way
> impact the nation's financial markets.  At the very least, we can see how
> Congress might have believed unwinding similar transactions could
> impact those markets. . . .

(emphasis in original).

District courts in this District have also looked beyond the apparently plain

language of section 546(e) to try to achieve Congress' intent on a nuanced basis.  Thus, in

Jackson v. Mishkin Judge Marrero identified five factors, the absence of which,

notwithstanding the plain language of section 546(e), would argue against applying

section 546(e):[11]

> (1) the transactions have long settled by means of actual transfers of
>     consideration, so that subsequent reversal of the trade may result in
>     disruption of the securities industry, creating a potential chain reaction
>     that could threaten collapse of the affected market;
>
> (2) consideration was paid out in exchange for the securities or property
>     interest as part of settlement of the transaction;
>
> (3) the transfer of cash or securities effected contemplates consummation
>     of a securities transaction;
>
> (4) the transfers were made to financial intermediaries involved in the
>     national clearance and settlement system;

---

[11] "Faced with the clash of interests in these provisions [section 546(e), on the one hand,
and the trustee's avoidance powers excepted by section 546(e), on the other], courts . . .
have identified a number of considerations which may prove helpful and persuasive in
deciding which Congressional intent should prevail, and which other vital legislative
policy should yield."  Jackson, 263 B.R. at 479.

(5) the transaction implicated participants in the system of intermediaries and guaranties which characterize the clearing and settlement process of public markets and therefore would create the potential for adverse impacts on the functioning of the securities market if any of those guaranties in the chain were invoked.

263 B.R. at 479-80 (internal citations omitted). See also Am Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp.2d 79, 107 (S.D.N.Y. 2004), where Judge Lynch favorably noted the foregoing factors in dicta. Jackson's first and fifth factors clearly would not apply to the transactions involved in this proceeding, whose avoidance would have little to no impact on a securities market, and the movants have not established that Jackson's fourth factor would apply, either.

Both Jackson and Am. Tissue preceded the 2006 Amendments and the circuit decisions that have more broadly applied section 546(e); however, in Alfa, S.A.B. de C.V. v. Enron Creditors Reovery Corp., decided thereafter, Judge McMahon continued to recognize that not all securities sales that arguably fit the section's plain meaning should be exempt from avoidance. 422 B.R. at 439-40. Instead, Judge McMahon noted, in dicta, that "This Court agrees with [Am. Tissue] that the five factors identified by [Jackson] should be considered in determining the applicability of the safe harbor to any particular set of novel facts."). Applying the foregoing factors to the facts at hand, however, the Alfa court distinguished Jackson, which involved "wholly phantom securities transactions . . . steeped in fraud," id. at 439 (quoting Jackson, 263 B.R. at 481), from the transactions before it, which, although not conducted in the ordinary course of the securities markets, involved a financial intermediary and a broker/financial institution and thus qualified as "settlement payments." Alfa, 422 B.R. at 433, 436-37, 440. Noting the SEC's argument that "reversing the $1.1 billion in actual transfers of

funds could be acutely disruptive to the affected market," Judge McMahon applied the

exemption.  Id. at 441-42.  (On the other hand the special master in In re Refco Secs.

Litig. v. CSFB, 2009 U.S. Dist. LEXIS 129944, at *20-28 (S.D.N.Y. Nov. 13, 2009)

applied a broad interpretation of section 546(e) without considering the Jackson factors,

to recommend the dismissal of a complaint seeking to avoid a private stock transaction.)

            The Am. Tissue court's endorsement of the Jackson factors was dicta

because the court found that the transfer at issue would qualify as an intentional

fraudulent transfer under section 548(a)(1) of the Bankruptcy Code.  351 F. Supp.2d at

108.  Similarly, as noted in Alfa, the transfers in Jackson were made in the context of

fraudulent or illegal schemes, 263 B.R. at 481, as were the transfers in Kipperman, 321

B.R. at 539 ("The few decisions that involve outright illegality or transparent

manipulation reject § 546(e) protection.").  Accord Picard v. Merkin (In re Bernard L.

Madoff Inv. Sec. LLC), 440 B.R. 243, 267-68 (Bankr. S.D.N.Y. 2010) (declining to

apply section 548(e) to a Ponzi scheme as contrary to Congressional intent as well as on

statutory construction grounds); see also 5 Collier on Bankruptcy at ¶ 564[2][b][1]

("Notwithstanding the broad definition of 'settlement payment,' courts have held that the

term does not encompass transactions that are illegal under applicable non-bankruptcy

law.").  Although such a gloss on section 546(e) extends the trustee's avoidance power

beyond the limits of section 548(a)(1) (and its two-year reach-back period), it is relatively

easy to conclude that Congress never could have meant to permit section 546(e) to

protect transactions that themselves were assaults on the securities markets, as that would

be a perversion of the statute's purpose.  See In re Adamo, 619 F.2d 216, 222 (2d Cir.

18

1980), <u>cert. denied</u> 449 U.S. 843 (1980) ("[A] statute should not be applied strictly in accord with its literal meaning where to do so would pervert its manifest purpose.").

 The harder question is whether line drawing based on presumed Congressional intent is permissible in the absence of such an illegal transaction context (although one can argue that because Congress drew a line when it expressly excluded from section 546(e)'s safe harbor only intentional fraudulent transfers under section 548(a)(1)). In other words, while it is quite easy to find that the avoidance of the transaction at issue here would have absolutely no impact on the financial markets, it is somewhat difficult to articulate a clear standard to distinguish this transaction from the facts of <u>QSI</u> or any number of hypothetical transactions in between.  <u>See</u> Edward P. Morrison & Joerg Riefel, "Financial Contracts and the New Bankruptcy Code:  Insulating Markets from Bankruptcy Debtors and Bankruptcy Judges," 13 Am. Bankr. Inst. L. Rev. 641, 663-64 (2005) (noting difficulty of drawing lines in section 546(e)'s safe harbor context).

 Nevertheless, in the light of section 546(e)'s textual context, which apparently focuses, in the midst of a circular and therefore ambiguous set of definitions, on the trade or business of securities transactions, reference to the legislative history is warranted.  That legislative history, including the history of the 2006 Amendment, makes it clear that Congress intended section 546(e) to address risks that the movants have failed to show conclusively are implicated by the avoidance of the transaction at issue here.  The Court should not, therefore, impose a result contrary to Congressional intent.  The movants in fact have not provided any evidence that the avoidance of the transactions at issue involved any entity in its capacity as a participant in any securities

market, or that the avoidance of the transactions at issue poses any danger to the functioning of any securities market.  Thus, section 546(e)'s safe harbor does not apply.  This result does not stem from a belief that Congress chose to use a sledgehammer when it should have used a scalpel.  See Lamie, 540 U.S. at 538 ("Our unwillingness to soften the impact of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding.  It results from deference to the legislature, as well as recognition that Congressmen typically vote on the language of the bill.").  It is, rather, required by Congressional intent as discerned from, first, the applicable statutory provisions, including their context within the Code, and, second, clear and consistent legislative history.

This conclusion obviates the need to consider other arguments for excepting the transactions at issue from section 546(e)'s safe harbor.  Given the conflicting precedents and the complexity of the foregoing analysis, however, it is also worthwhile to address the Trustee's alternative, narrower argument for not applying section 546(e) to the stock sales.  The Trustee contends that because the Debtor's purchase of the Shareholders' stock in the absence of a corporate surplus was an impermissible payment under New York Business Corporation Law ("NY BCL") § 513(a) (McKinney 2007), the sale was either (1) void *ab initio* and, therefore, was not a settlement payment or a transfer for purposes of section 546(e), or (2) unlawful and, therefore, outside the exemption based on those authorities, discussed above,[12] that have

---

[12] See Picard v. Merkin, 440 B.R. at 267-68.

refused to shelter transfers made as part of an illegal or pervasively fraudulent scheme

because to do so would pervert section 546(e)'s purpose.[13]

        NY BCL § 513(a) provides that "the shares of a corporation may not be

purchased by the corporation . . . if the corporation is then insolvent or would thereby be

made insolvent.  Shares may be purchased or redeemed only out of surplus."  NY BCL §

514(a) (McKinney 2007) further provides that "An agreement for the purchase by a

corporation of its own shares shall be enforceable by the shareholder and the corporation

to the extent such purchase is permitted at the time of purchase by section 513."  Asked

to apply section 546(e)'s exemption to a transfer challenged under a similar, though not

identical, Oregon statute, Judge Gonzalez decided in Enron Corp. v. Bear, Stearns Int'l

Ltd. (In re Enron Corp.), 323 B.R. 857 (Bankr. S.D.N.Y. 2005) ("Enron/Bear, Stearns"),

---

[13] The Trustee has also argued that his rights under NY BCL § 513(a) do not derive from
Bankruptcy Code section 544 or any of the other sections of the Code expressly
precluded by section 546(e) but, rather, from the Debtor's separate, pre-bankruptcy right
to attack an improper shareholder payment.  It appears, however, that NY BCL § 513(a)
is invoked offensively (as opposed to the corporation's right to defend against
enforcement of a share purchase agreement) by or on behalf of creditors and, therefore, is
properly assertable by the Trustee under Bankruptcy Code section 544(a).  See, e.g.,
Cross v. Beguelin, 252 N.Y. 262, 265-66 (1929); New York Credit Men's Ass'n v.
Harris, 170 Misc. 980, 11 N.Y.S.2d 435, 438-440 (N.Y. Sup. N.Y. Cty. 1939), affd 262
A.D. 826 (N.Y. App. Div. 1941); David McDonough, Inc. v. Berger, 22 Misc.2d 646,
192 N.Y.S.2d 702, 705 (N.Y. Sup. N.Y. Cty. 1959).  See also In re Industrial Ceramics,
Inc., 253 B.R. 323, 334 (Bankr. W.D.N.Y. 2000); In re Le Café Crème, Ltd., 244 B.R.
221, 244 (Bankr. S.D.N.Y. 2000); In re Eljay Jrs., Inc., 106 B.R. 775, 782 (Bankr.
S.D.N.Y. 1989), aff'd 123 B.R. 961 (S.D.N.Y. 1991) (each referring to the debtor in
possession or trustee bringing a NY BCL § 513(a) claim based on the standing conferred
by Bankruptcy Code section 544).  Accordingly, the Court need not consider whether a
claim under NY BCL § 513(a) would be preempted by section 546(e).  See
Contemporary Indus., 564 F.3d at 988; Hechinger, 274 B.R. at 96; In re Loranger Mfg.
Corp., 324 B.R. 575, 583 (Bankr. W.D. Pa. 2005) (each holding that state law unjust
enrichment or improper distribution claims were preempted as wholly frustrating the
purpose of section 546(e)).

that the exemption did not apply.[14]  The court clearly did so, however, because under

Oregon law an improper distribution is a nullity, void *ab initio*, and, therefore, as there

was "no settlement obligation to discharge nor any securities transaction to complete, . . .

the transaction would have . . . no legal effect at all" and thus would not be covered by

section 546(e)'s plain language.  Id. at 876-77.

> Judge Gonzalez distinguished the effect of the Oregon statute at issue

from a similar statute at issue in a decision[15] that applied section 546(e) where, under

Delaware law, the improper distribution was only "potentially voidable," not a nullity,

because the shareholder's good faith was a statutory defense.  Id. at 877-88 ("[V]oidable

agreements are legal, as a matter of law, until the agreements are avoided.  It is those

types of transactions that [under section 546(e)] a trustee cannot attack under its statutory

avoidance authority.  This conclusion does not undermine Congressional intent.  Indeed,

independent of the Bankruptcy Code, as a matter of state law, no party in the guaranty

chain has any obligations under void agreements.").  See also Contemporary Indus., 564

F.3d at 988 (distinguishing Enron/Bear, Stearns on the same basis).

> Is an agreement providing for a payment that violates NY BCL §§ 513(a)

and 514(a) void *ab initio*?  From the NY BCL itself, it appears, to the contrary, that such

an agreement is merely voidable, upon a showing that the corporation is insolvent when

the payment is made.  Thus NY BCL § 514(b) (McKinney 2007) provides that "The

---

[14] Or. Rev. Stat. § 60.181, at issue in Enron/Bear, Stearns, provided in relevant part, "(1)
… the corporation may make distributions to its shareholders subject to … the limitation
in subsection (3)….  (3) A distribution may be made only if, after giving it effect … (a)
The corporation would be able to pay its debts as they become due in the usual course of
business, and (b) The corporation's total assets would at least equal the sum of its total
liabilities…."

[15] PHP Liquidating LLC v. Robbins, 291 B.R. 592, 598 (D.Del. 2003).

possibility that a corporation may not be able to purchase its shares under section 513

shall not be a ground for denying to either party specific performance of an agreement for

the purchase by a corporation of its own shares, if at the time for performance the

corporation can purchase all or part of such shares under section 513." That is, under NY

BCL § 514(b) a corporation's agreement to purchase its own shares is only possibly

unenforceable, depending on whether, at the time of performance, the corporation has a

surplus. 1-5 White, New York Business Entities ¶ B514.01 (2010); see also Richards v.

Ernst Wiener Co., 207 N.Y. 59, 65 (1912) (construing predecessor statute: "The contract

itself, therefore, was perfectly legal subject to certain limitations upon its

enforceability.").

        In addition, it has long been held that there is an exception to the

enforcement of NY BCL § 513 (and it predecessors) by or on behalf of subsequent

creditors and shareholders who had sufficient notice of the share purchase. In re Flying

Mailmen Serv. Inc., 539 F.2d 866, 870-72 (2d Cir. 1976); In re Eljay Jrs., Inc., 106 B.R.

775, 782 (Banrk. S.D.N.Y. 1989), aff'd 123 B.R. 961 (S.D.N.Y. 1991); Sarkin v. Nates

Auto Parts, Inc., 166 Misc.2d 913, 636 N.Y.S.2d 985 (Sup. Ct. St. Lawrence Cty. 1995);

Nakano v. Nakano McGlone Nightingale Advertising, Inc., 84 Misc.2d 905, 908, 377

N.Y.S.2d 996 (Sup. Ct. N.Y. Cty. 1975) ("[W]here creditors became such with notice of

the purchase, and the redemption is in good faith, the purchase does not infringe upon or

prejudice creditor's rights."); 1-5 White, New York Business Entities at ¶ 513.02 ("Note

that the statute is in place to protect innocent creditors and, presumably, other

shareholders who may be adversely affected by illegal purchases; it cannot be used to

protect well-informed buyers from financial gimmicks of their own design in leveraged buyouts."). Therefore, the Trustee's argument based on Enron/Bear, Stearns fails.

The Trustee also contends that payments in violation of NY BCL § 513 are "illegal" (and thus fit the illegal conduct exception to section 546(e) recognized in the case law discussed above) under NY Penal Law § 190.35 (McKinney 2007). Although at times agreements in violation of NY BCL § 513 or its predecessors are referred to as "illegal," see, e.g., Application of Luff, 201 Misc. 22, 109 N.Y.S.2d 54 (N.Y. Sup. Queens Cty. 1951), it is clear from the plain terms of NY Penal Law § 190.35, however, that to be criminally liable a director must have intended to pay a stockholder when there was no surplus, a fact that the parties have agreed does not apply to the matter before the Court. NY Penal Law § 190.35 provides that "A person is guilty of misconduct by corporate official when: (1) Being a director of a stock corporation he knowingly concurs in any vote or act of the directors of such corporation or any of them, by which it is intended: . . . (b) To . . . in any manner pay any stockholder any part of the capital stock of the corporation except in the manner provided by law." See also Richards v. Enrst Wiener, 207 N.Y. at 65 ("The law will not presume, unless forced to do so, that a person intends to do an illegal act. It will not, therefore, presume that the parties intend to make an illegal contract.").

In addition, as noted above, it has long been held that such agreements are not inherently unlawful but only rendered unenforceable under certain circumstances with respect to certain corporate constituents who have acted in good faith and without knowledge of the transfer, on whose behalf the corporation may recover improper

payments.  Cross v. Beguelin, 252 N.Y. 262, 265-66 (1929); In re Flying Mailmen, 539

F.2d at 870-72.

Therefore, if section 546(e)'s safe harbor applied to the Shareholders, the

Trustee would not prevail on the basis that the payments to the Shareholders under the

Stock Purchase Agreement violated NY BCL §§ 513 and 514.

**The Lender's Summary Judgment Motion.**  Like the Shareholders, the

Lender has relied on section 546(e)'s safe harbor to protect it from the Trustee's

avoidance claims (with the exception of the Trustee's claims under sections 547(b) and

549 of the Bankruptcy Code).  However, for the reasons discussed above with regard to

the Shareholders' summary judgment motion, which apply equally to the Lender, the safe

harbor of section 546(e) does not protect the Lender.

Section 546(e) does not apply to the Trustee's claim to avoid the Debtor's

incurrence of the loan obligation to the Lender for another reason, also.  Section 544(a) of

the Bankruptcy Code provides that "The trustee . . . may avoid any transfer of property of

the debtor or any obligation incurred by the debtor that is voidable by" the three types of

entities listed in subsections (1) through (3) of that section (emphasis added).  Similarly,

section 548(a)(1) of the Bankruptcy Code provides that "The trustee may avoid any

transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the

debtor, that was made or incurred on or within 2 years before" the petition date, if, under

subsection 548(a)(1)(A), the transfer or the incurrence of the obligation was intentionally

fraudulent, or, under subsection 546(a)(1)(B), was constructively fraudulent (emphasis

added).[16]  On the other hand, section 546(e) provides only that "the trustee may not avoid a transfer" (emphasis added); it does not, by its plain terms, extend the safe harbor to the trustee's avoidance of the incurrence of an obligation.

There clearly is a difference between making a transfer and incurring an obligation; otherwise, the relevant statutory provisions would not have used both terms. See Rake v. Wade, 508 U.S. 464, 471 (1993) ("To avoid deny[ing] effect to a part of a statute, we accord significance and effect . . . to every word.") (internal quotation and citations omitted).  Relatedly, Bankruptcy Code section 101(54) broadly defines "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with -- (i) property; or (ii) an interest in property," 11 U.S.C. § 101(54)(D) (as well as "the creation of a lien, the retention of title as a security interest, and the foreclosure of a debtor's equity of redemption," 11 U.S.C. § 101(54)(A)-(C)), but the definition does not include the incurrence of an obligation.  A "transfer" -- even under the exceedingly broad Bankruptcy Code definition -- is ultimately a disposition of property.  If avoided, a transfer is preserved under Bankruptcy Code section 551 and recoverable under Bankruptcy Code section 550, while the avoidance of an obligation, which is not mentioned in Bankruptcy Code sections 550 and 551, instead reduces dollar for dollar the claims that the estate must pay; there is nothing

---

[16] See also 11 U.S.C. § 548(c):  "Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."

to preserve or bring back.[17]  Similarly, section 502(d) of the Bankruptcy Code provides

for the disallowance of "any claim" of an entity from which property is recoverable under

section 550 or that is a transferee of an avoidable transfer, regardless whether the claim is

related to the transfer, but is silent as to the disallowance of any claim of the obligee of an

avoided obligation.[18]

The distinction between a transfer and the incurrence of an obligation has

also been recognized in the case law.  See Covey v. Commercial Nat'l Bank, 960 F.2d

657, 661 (7th Cir. 1992) ("Although a note or guarantee is not a 'transfer' for purposes of

11 U.S.C. § 101(54), both note and guarantee are obligations.") (internal citations

omitted); In re Asia Global Crossing, Ltd., 333 B.R. 199, 204 (Bankr. S.D.N.Y. 2005)

("[T]he Guaranty gave [defendant] a chose in action against [the debtor], conditioned on

the default of the [primary obligor].  It did not grant [defendant] any interest in or right to

[the debtor's] property.  As such, it was an 'obligation' rather than a 'transfer' within the

meaning of § 101(54)").  In Covey the distinction between "transfer" and "obligation"

governed the date for the court's determination of solvency for avoidance purposes, 960

---

[17] "Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724 of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property. . . ."  11 U.S.C. § 550(a).

"Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate."  11 U.S.C. § 551.

[18] "Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."  11 U.S.C. § 502(d).

F.2d at 661; in Asia Global Crossing, the distinction meant that the defendant's other claims against the estate would not be disallowed under Bankruptcy Code section 502(d), because the trustee was avoiding only an obligation, not a transfer, and avoidable obligations do not trigger rights under section 502(d).  333 B.R. at 202-204.

It is clearly proper, therefore, to presume that section 546(e) does not implicitly adopt a definition of "transfer" that somehow includes the "incurrence of an obligation."  "Transfer" is, of course defined in section 101(54), as discussed above, and the cross reference in section 546(e) to sections 544 and 548 points one immediately to the fact that sections 544 and 548 use both "transfer" and "the incurrence of an obligation" while section 546(e) uses only "transfer."  See also In re Enron Corp., 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004) ("There is a presumption that identical words in different parts of the same statute have the same meaning."), citing Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932).

Although there is no ambiguity or clearly inconsistent pre-enactment practice to support defining "transfer" in section 546(e) differently than how it is used in the rest of the Code (cf. Dewsnup v. Timm, 502 U.S. 410, 419-20 (1992)), it might be argued that avoiding the Debtor's incurrence of its loan obligation to the Lender blows such a hole in section 546(e)'s safe harbor that it would be absurd and clearly contrary to congressional intent to follow the statute's plain meaning.  See Ron Pair, 489 U.S. at 242; Am. Trucking, 310 U.S. at 543-44.[19]  Applying section 546(e)'s plain terms to exclude

---

[19] This argument is superficially bolstered by the 2006 Amendment, which expanded the exemption to cover "a transfer by or to … a financial institution … in connection with a securities contract, as defined in section 741(7)."  11 U.S.C. § 546(e).  However, as discussed above, nothing in the legislative history suggests that Congress intended the 2006 Amendment to exempt lenders from a trustee's avoidance powers where, as here,

the avoidance of obligations would not render the exemption completely meaningless,

however, for parties like the Lender -- far from it.  For example, any payments and any

lien that the Lender received in connection with the securities contract would not be

avoidable, because they were transfers.  Nor, hypothetically, would a lien granted at the

time of the LBO to cover already existing non-avoidable debt be avoidable.  Finally, as

discussed above, if the Lender had other claims against the debtor, those claims would

not be subject to disallowance under Bankruptcy Code section 502(d), which applies only

to recipients of avoidable transfers, not to those with avoidable obligations.  The Lender

also would have the benefits of any defenses to the avoidance of the LBO loan, including

those based on the Lender's good faith and knowledge, which may be significant in the

LBO context.  See Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.), 379 B.R.

5, 21-4 (Bankr. E.D.N.Y. 2007); In re Best Prods. Co., 168 B.R. 35, 57 (Bankr.

S.D.N.Y.); see also Mervyn's, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's

Holdings, LLC), 426 B.R. 488, 497 (Bankr. D. Del. 2010).  Finally, lenders would

continue to retain their contractual rights and claims, if any, against the shareholders in an

LBO, which could be meaningful if such parties, contrary to the first section of this

decision, were permitted by section 546(e)'s safe harbor to protect their sale proceeds

from the trustee.  Therefore, even if, contrary to the conclusion in the first section of this

decision, section 546(e) applied to this type of private LBO transaction, the Debtor's

incurrence of the loan obligation to the Lender would not be protected by section 546(e)'s

safe harbor.

---

no party was acting in its capacity as a participant in a securities market and the
avoidance of the transaction would not pose any risk to any securities market, let alone
that Congress implicitly intended to exempt the avoidance of the debtor's incurrence of
an obligation notwithstanding the statute's failure to use such terms.

The Lender's motion raises one additional defense to the Trustee's claims besides section 546(e). It contends that because the loan was a Small Business Administration guaranteed loan, with the SBA in some measure being the real economic party in interest, 13 C.F.R. § 101.106(d) (the "Regulation") precludes avoidance of the loan and security interest. That Regulation (enacted under the SBA Administrator's authority under 15 U.S.C. § 634(b)(6)), provides, "No person, corporation, or organization that applies for and receives any benefit or assistance, is entitled to claim or assert any local or state law to defeat the obligation incurred in obtaining or assuring such Federal benefit or assistance." The Lender contends that the Trustee therefore may not invoke section 544(a) of the Bankruptcy Code against it because section 544(a) gives the Trustee the avoidance powers of a creditor and a hypothetical good faith purchaser under applicable state law.[20]

The Lender cites no case law or other authority besides the Regulation to support this argument, nor has the Trustee cited any cases in opposition, with the exception of decisions avoiding SBA liens, which do not discuss the Lender's argument and to which the Regulation on its face would not appear to apply. It appears clear, however, that the Regulation does not preclude the Trustee's claim under section 544(a) of the Bankruptcy Code, for two reasons.

First, to the extent that the Regulation is viewed as a limitation on standing, it would not apply to the Trustee, who has independent standing under section 544, as opposed to under state law. See Nisselson v. Empyrean Inv. Fund, L.P. (In re

---

[20] Even under the Lender's argument, the Regulation would not apply to the Trustee's use of Bankruptcy Code section 548, a wholly federal right. Similarly, the Regulation appears to apply only attempts to defeat obligations, not liens.

MarketXT Holdings Co.), 376 B.R. 390, 423 (Bankr. S.D.N.Y. 2007) (Wagoner Rule/in pari delicto doctrine do not apply to trustee's statutory standing under section 544).

Second, the Court is obligated to harmonize the Regulation and the Bankruptcy Code before finding that one invalidates the other. While the Regulation serves a clear purpose vis a vis individual obligors in a non-bankruptcy context, it does not, by its plain terms trump Bankruptcy Code section 544, which is a federal, not a state, provision, that only incorporates state avoidance law for the Trustee's (and the Debtor's estate's) benefit in that express federal context. (This is particularly apt under the present facts, it being highly doubtful that the Debtor, let alone the Trustee, "received any benefit or assistance" on account of the loan, which went to pay the Shareholders on account of their stock while the Debtor was insolvent.)

Therefore, because section 546(e)'s safe harbor does not extend to the avoidance of an obligation, and the Regulation does not preempt section 544 of the Bankruptcy Code, the Lender's summary judgment motion should be denied on this separate, alternative basis to the extent that the Trustee seeks to avoid the incurrence of the Debtor's obligation to the Lender for the LBO loan.

## Conclusion

For the foregoing reasons, both the Lender's and the Shareholders' summary judgment motions should be denied as set forth herein. Counsel for the Trustee should submit a separate order denying each motion consistent with this decision.

Dated: White Plains, New York
         April 21, 2011

                                             /s/ Hon. Robert D. Drain
                                        **UNITED STATES BANKRUPTCY JUDGE**